**UNITED STATES of America,**
**Appellee,**

v.

**Freddy FERMIN, Juan Fermin,**
**Defendants–Appellants.**

**Nos. 06–2068–cr(L), 06–2090–cr(Con).**

United States Court of Appeals,
Second Circuit.

May 6, 2008.

Cheryl J. Sturm, Chadds Ford, PA, for Defendant–Appellant, Freddy Fermin.

Avrom Robin (Ira D. London, on the brief), New York, NY, for Defendant–Appellant Juan Fermin.

Benjamin Naftalis, Assistant United States Attorney (William C. Komaroff, Katherine Polk Failla, Assistant United States Attorneys, of counsel; Michael J. Garcia, United States Attorney, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

PRESENT: Hon. CHESTER J. STRAUB, and Hon. REENA RAGGI, Circuit Judges, and Hon. SIDNEY H. STEIN,* District Judge.

## SUMMARY ORDER

Defendants–Appellants Juan Fermin ("Juan") and Freddy Fermin ("Freddy") appeal from judgments of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge*) entered on April 26 and April 28, 2006, respectively, sentencing Juan principally to 292 months' imprisonment for operating a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(a), concurrently with 240 months' imprisonment for running a business for the purpose of distributing narcotics in violation of 21 U.S.C. § 856(a); and sentencing Freddy principally to 262 months' imprisonment for conspiring to distribute and possess with intent to distribute narcotics in violation of 21 U.S.C. § 846, concurrently with 240 months' imprisonment for running a business for the purpose of distributing narcotics in violation of 21 U.S.C. § 856(a). Juan and Freddy were convicted of these and other counts following a jury trial in 1992. *See United States v. Fermin*, 32 F.3d 674, 675–76 (2d Cir.1994), *cert. denied*, 513 U.S. 1170, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995). We assume the parties' familiarity with the balance of the

* The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

facts, procedural history, and issues on appeal. For the reasons that follow, we affirm the judgments of the District Court.

## I. Juan's CCE Conviction

Juan asks us to vacate his CCE conviction on the grounds that (1) the jury instructions did not comply with the Supreme Court's subsequent decision in *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); (2) the Superseding Indictment failed to specify the three violations found by the jury to constitute the continuing series; and (3) the jury's response to the interrogatory regarding the three violations was insufficient.

### A. Jury Instructions

■ Juan abandoned his challenge to the jury instructions at the sentencing hearing. In any event, as Juan apparently realized, the challenge is meritless. Judge Louis J. Freeh expressly charged the jury, "You must, however, unanimously agree on which three acts constitute the continuing series of violations." This instruction complied with *Richardson*'s requirement that a jury "agree unanimously about which specific violations make up the 'continuing series of violations.'" *See Richardson,* 526 U.S. at 815, 119 S.Ct. 1707; *see also* 3 L. Sand, *et al.,* MODERN FEDERAL JURY INSTRUCTIONS—CRIMINAL § 56.04, Instr. 56–28 ("You must unanimously agree on which three acts constitute the continuing series of violations."); *cf. Monsanto v. United States,* 348 F.3d 345, 347, 349 (2d Cir.2003) (instruction that failed to "tell the jury that it needed to unanimously agree on which narcotics violations constituted the 'series of violations'" violated *Richardson* ).

### B. Indictment

■ Juan's argument that the Superseding Indictment was defective for failing to specify the three violations found by the jury to support the CCE conviction is foreclosed by our decision in *United States v. Flaharty,* 295 F.3d 182, 198 (2d Cir.), *cert. denied,* 537 U.S. 936, 123 S.Ct. 37, 154 L.Ed.2d 237 (2002). "[A]n indictment that does not identify which of many alleged felonies constituted the series is not thereby defective." *Id.* at 197. In this case, Count 1 of the Superseding Indictment closely tracked the language of 21 U.S.C. § 848(c) and alleged that the continuing series was composed of, among other felonies (specifically including the violations alleged in Counts 2 and 3, which were expressly incorporated into Count 1), violations of 21 U.S.C. § 843(b), which forbids the use of a telephone to facilitate the commission of a narcotics felony. The indictment further charged the approximate time and place of the enterprise. Such an indictment is sufficient under *Flaharty.*

### C. Jury's Response to the Interrogatory

Similarly, there is no merit to Juan's argument that the jury's responses to the special interrogatories on the CCE count require vacating his conviction. We do not require district courts to use special interrogatories for a CCE charge. *See United States v. Ogando,* 968 F.2d 146, 149 (2d Cir.1992) ("[W]e commit the decision of whether and how to utilize special interrogatories in such cases to the broad discretion of the district court."). We have, however, indicated that for such a charge "the trial court would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases." *United States v. Roman,* 870 F.2d 65, 73 (2d Cir.1989).

■ Here, the jury was asked if the offense involved "at least three offenses in a continuing series of violations of the federal narcotics laws?" The jury was

then asked to "specify three such offenses." The jury's identification of three government exhibits in response sufficiently enabled "an assessment of whether the jury's determination of guilt rested on permissible bases." Indeed, when the District Court asked if there were "any other requests by the defendants in the presence of the jury?," Juan's attorney asked only that the jury be polled. That Juan's challenge to the jury's answer to the interrogatory did not arise until March 31, 2004, almost twelve years after the verdict was rendered, reinforces our conclusion that the answer provided sufficient specificity to support the verdict. *Cf. United States v. Quinones*, 511 F.3d 289, 308 (2d Cir. 2007) (noting that defendants' failure to raise a contemporaneous objection to prosecutor's misstatement in summation reinforces conclusion "that the misstatement was inadvertent and neither intended nor understood to suggest that uncharged evidence demonstrated defendants' propensity to commit drug crimes").

Because Juan's challenges to his CCE conviction fail on the merits, we need not address the government's alternative argument that they are procedurally barred.

### Sentencing Challenges

The remainder of Juan's and Freddy's arguments challenge several aspects of the District Court's sentences. We review a district court's sentence for procedural and substantive reasonableness, a standard "akin to review for abuse of discretion." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir.), *cert. denied* —— U.S. ——, 127 S.Ct. 192, 166 L.Ed.2d 143 (2006); *see also Gall v. United States*, —— U.S. ——, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). In reviewing for procedural reasonableness, an appellate court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines

range." *Gall*, 128 S.Ct. at 597. We review a district court's interpretation of the Sentencing Guidelines *de novo*, and apply the clear error standard when evaluating a district court's findings of fact. *See United States v. Richardson*, 521 F.3d 149, 156–57 (2d Cir.2008).

### II. Freddy's Criminal History Category

Freddy argues that the District Court erred by placing him in Criminal History Category ("CHC") IV because (1) the law of the case precludes changing the CHC III determination made at his first sentencing and (2) the government failed to prove that the conviction in question was not part of the instant offense.

#### A. The Law of the Case

Freddy no longer disputes the finality of his 1987 New York state conviction for fourth-degree possession of a narcotic drug, arising from an arrest on February 20, 1986. Freddy argues, rather, that because he was first sentenced in 1993 under CHC III, the District Court violated the law of the case by sentencing him under CHC IV in 2006 following vacatur of his 18 U.S.C. § 924(c) conviction by the District Court in light of *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

■ The law of the case does not bar recalculation of Freddy's CHC. "When a defendant challenges convictions on particular counts that are inextricably tied to other counts in determining the sentencing range under the guidelines, the defendant assumes the risk of undoing the intricate knot of calculations should he succeed. Once this knot is undone, the district court must sentence the defendant *de novo* and, if a more severe sentence results, vindictiveness will not be presumed." *United States v. Atehortva*, 69 F.3d 679, 685–86 (2d Cir.1995) (citation omitted), *cert. de-*

*nied sub nom. Correa v. United States,* 517 U.S. 1249, 116 S.Ct. 2510, 135 L.Ed.2d 199 (1996); *see also United States v. Quintieri,* 306 F.3d 1217, 1227–28 (2d Cir.2002) ("A district court's sentence is based on the constellation of offenses for which the defendant was convicted and their relationship to a mosaic of facts, including the circumstances of the crimes, their relationship to one another, and other relevant behavior of the defendant.... For the district court to sentence the defendant accurately and appropriately, it must confront the offenses of conviction and facts anew."), *cert. denied sub nom. Donato v. United States,* 539 U.S. 902, 123 S.Ct. 2246, 156 L.Ed.2d 110 (2003).

Freddy successfully challenged his § 924(c) conviction, thereby paving the way to a new sentence on his related drug counts. *See United States v. Mata,* 133 F.3d 200, 201–02 (2d Cir.1998) (per curiam) (holding that district court has jurisdiction to resentence after vacatur of § 924(c) conviction and finding no double jeopardy nor due process violation); *United States v. Gordils,* 117 F.3d 99, 102 (2d Cir.) (holding that district court may "resentence a defendant on a related, unchallenged drug conviction when the defendant has successfully challenged his § 924(c) conviction pursuant to *Bailey* "), *cert. denied,* 522 U.S. 975, 118 S.Ct. 430, 139 L.Ed.2d 330 (1997); *Rodriguez v. United States,* 116 F.3d 1002 (2d Cir.), *cert. denied,* 522 U.S. 962, 118 S.Ct. 396, 139 L.Ed.2d 309 (1997). Nothing in the law of the case doctrine precluded the District Court from recalculating Freddy's criminal history category upon resentencing him. In fact, the District Court was "required to resentence [Freddy] in light of the circumstances as they stood at the time of his resentencing." *Werber v. United States,* 149 F.3d 172, 178 (2d Cir.1998).

We further note that even when the law of the case bars reconsideration of an issue, district courts may depart from the law of the case and "reconsider their own decisions for cogent and compelling reasons if those decisions have not been ruled on by the appellate court." *Quintieri,* 306 F.3d at 1230. This principle applies "whether the resentencing results from a remand after direct appeal or from a successful § 2255 motion." *Id.* at 1231 n. 8. As the government points out, by 2006, Freddy's 1987 conviction had become final and Freddy no longer challenged it on the basis of ineffective assistance of counsel. The District Court was therefore entitled to reconsider Freddy's CHC due to this change in the status of his 1987 conviction. *Cf. United States v. Cox,* 245 F.3d 126, 130–31 (2d Cir.2001) ("In light of the dismissal of his 1999 state conviction, therefore, Cox is entitled to a review of his federal sentence, which was enhanced on account of a prior conviction that now has been dismissed."); *United States v. Doe,* 239 F.3d 473, 475 (2d Cir.2001) (per curiam) ("[D]efendants who successfully attack state convictions may seek review of federal sentences that were enhanced on account of such state convictions.").

## B. *Part of the Instant Offense*

Freddy further challenges the inclusion of his 1987 conviction in the calculation of his CHC on the ground that the government failed to prove that the conviction was not part of the instant offense.

In order to count a "prior sentence" towards a defendant's CHC, that sentence must have been imposed "for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 4A1.2, cmt. n. 1. That

Guideline, in turn, encompasses acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

In the related context of the career offender guidelines, we have held that a defendant bears the burden of proving that the prior crimes were part of a common scheme. *See United States v. Brothers,* 316 F.3d 120, 124 (2d Cir.2003) (per curiam); *United States v. Butler,* 970 F.2d 1017, 1026 (2d Cir.) ("[T]hough the government generally has the burden of proving facts upon which the requested penalties are predicated, we disagree that it has the burden of proving that the acts underlying a defendant's prior unconsolidated convictions were not committed as part of a single common scheme or plan."), *cert. denied sub nom. Harris v. United States,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).

■ Similarly, once the government established that Freddy had a prior sentence, the burden then shifted to Freddy to persuade the District Court that the prior sentence was for conduct that is part of the instant offense and so should not count in calculating his criminal history. *Cf. United States v. O'Neil,* 118 F.3d 65, 76 (2d Cir.1997) (holding that under criminal history guidelines once government established defendant was on lifetime parole, burden shifted to defendant to prove that he had been discharged from parole), *cert. denied sub nom. Saia v. United States,* 522 U.S. 1064, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998).

Accordingly, Freddy's argument is unavailing.

## III. Drug Quantity

### A. Sufficient Evidence

The Fermins challenge the District Court's finding of 33.2 kilograms of cocaine

in setting the base offense level. "When addressing a claim that there was insufficient evidence to support a district court's drug quantity finding, we are mindful that the district court has broad discretion to consider all relevant information and the quantity determination will not be disturbed unless it is clearly erroneous." *United States v. Snow,* 462 F.3d 55, 72 (2d Cir.2006) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 127 S.Ct. 1022, 166 L.Ed.2d 770 (2007).

At the most recent sentencing, the District Court adopted the quantity findings that Judge Freeh had made in 1993 with respect to both defendants, further noting that Judge Freeh had likely underestimated the quantity.

The defendants argue that 33 kilograms must be too much because, for example, little to no drugs were actually seized; not much cash was seized and the defendants' drug ledger reflected only $36,000 in sales; and undercover agents did not observe or participate in any sales.

■ The Guidelines recognize that the quantity seized might not reflect the scale of the offense. *See* U.S.S.G. § 2D1.1, cmt. n. 12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."). Moreover, our review of Judge Freeh's determination reveals that he considered defendants' exculpatory evidence when approximating the quantity. Judge Freeh noted the "almost nonexistent" "amount of narcotics" seized and the absence of drug records, money laundering activities, and witnessed transactions. And when reviewing the transcripts, Judge Freeh, who presided over defendants' trial and the retrial of their brother Hector, frequently rejected the government's interpretations of the conversations as re-

flecting larger quantities. The quantity determination was not clearly erroneous.

### B. *Amendment 518*

The Fermins argue that the District Court failed to apply Guidelines Amendment 518 so as to exclude from the calculation the amounts they "did not intend to provide or purchase or [were] not reasonably capable of providing or purchasing." U.S.S.G. § 2D1.1, cmt. n. 12; *see also* Amendment 518, U.S.S.G.App. C at 430, 431, 433 (1997) (effective Nov. 1, 1995).

After the Fermins' first sentencings, Amendment 518 modified slightly the quantity analysis. Among other changes, the revision made "lack of either intent or capability a ground for reducing the quantity for which a defendant could be sentenced. The previous Note 12 had permitted a reduction of quantity only if a defendant lacked both intent and capability." *United States v. Dallas*, 229 F.3d 105, 109 (2d Cir.2000) (citation omitted). In addition, Amendment 518 clarified somewhat the burdens on the parties with respect to these issues:

> The Government first has to demonstrate by a preponderance of the evidence that the defendant intended to provide the buyer with the alleged amount of drugs, and was reasonably capable of providing that amount. The defendant then "must *produce* evidence tending to establish lack of intent or inability to deliver the alleged quantity of drugs." The defendant must offer more than simply counsel's argument that he lacked intent and ability. If the defendant meets this burden of production, the burden of proof shifts back to the Government: "the ultimate burden of proof with respect to intent and ability rests with the government."

*Id.* (quoting *United States v. Hazut*, 140 F.3d 187, 191–93 (2d Cir.1998)) (citations omitted). We noted that Amendment 518 had not altered our conclusion under prior versions that the government has the ultimate burden of proof. *Hazut*, 140 F.3d at 192.

■ To establish lack of intent or inability, the Fermins point to essentially the same evidence they relied on to argue that the quantity found vastly overstated their culpability. The District Court was not persuaded by this evidence, noting that the defendants' drug ledger might not "relate to the entirety of the business that was done" and a small profit margin could explain the absence of "vast amounts of cash." The District Court determined that Judge Freeh's calculations had excluded "mere puffery." Indeed, in refusing to extrapolate the quantity over the course of the conspiracy, Judge Freeh had said, "At times the organization appears to be able to distribute. At other times it appears to be unable to distribute any amount of narcotics." In addition, at least as to Juan, Judge Freeh said that all of his quantity calculations were "done on the basis of my findings that the defendant either directly transacted or controlled the narcotics or dollar amounts which are cash proceeds, or was responsible for controlling them because of his position and leadership in this conspiracy."

The District Court did not err in finding that the government had met its burden of proof in accordance with Amendment 518.

### C. *Freddy's Responsibility*

■ Freddy further argues that because he was no longer the subject of an aggravating role enhancement, the District Court was now required to make particularized findings regarding the scope of the agreement and reasonable foreseeability. The absence of the role enhancement did not alter the District Court's obligations to determine the relevant conduct for which

Freddy was responsible under U.S.S.G. § 1B1.3. More importantly, the District Court adequately discharged its obligation to explain the factual findings underlying its determination of the Guidelines range. As previously noted, the District Court adopted the quantity findings that Judge Freeh had made in 1993 with respect to both defendants.

Although the District Court did not explicitly discuss the scope of Freddy's agreement and reasonable foreseeability in 2006, the extent of Freddy's responsibility had previously been addressed by both Judge Freeh and Judge Mukasey. At Juan's sentencing on March 2, 1993, Judge Freeh found that Juan and Freddy "were equally situated as joint venturers and partners regarding the narcotics-related business.... [T]hey both had extensive and continuous conversations between themselves and others regarding the drug transactions as well as cash transactions related to those narcotics." Judge Freeh incorporated this finding when he commenced Freddy's sentencing on March 31, 1993, noting that Freddy was "a joint and coventurer with respect to Juan ... in the extensive and continuous operations which both defendants undertook over an extensive period of time." On remand, at the December 1994 sentencing, Judge Mukasey rejected the government's arguments for a supervisory role enhancement or an upward departure based on control over the resources, but found that Freddy "was sharing equally with his brother." In addition, the PSR states that Freddy "was Juan's right-hand man" and that the two "discussed most of the narcotics-related business decisions that had to be made before those decisions were made." [1] The basis for holding Freddy responsible for the same quantity as Juan was thus clear. *See Snow,* 462 F.3d at 72 ("Ultimately, the question is whether the conspiracy-wide quantity was within the scope of the criminal activity the defendant agreed to and whether the activity in question was foreseeable to the defendant."); *United States v. Studley,* 47 F.3d 569, 575 (2d Cir.1995) (factors to determine scope of agreement include whether participants pool their profits and resources, whether defendant assisted in designing and executing the illegal scheme, and the role defendant agreed to play in the operation).

## IV. Firearms Enhancement

 Juan and Freddy each challenge the imposition of a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with a narcotics offense. "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.3.

Defendants point to evidence regarding the firearms and argue it is "clearly improbable" that the firearms were connected with their narcotics offenses.

Juan argues that the shotgun found at 3 Way was registered to him, was not used, and was stored in a closet out of reach. Juan argues that the absence of evidence of use makes it "reasonable to assume that

---

1. We have held that it is not plain error to rely on a PSR's findings even though, as here, they were not explicitly adopted in open court, so long as the findings are adequate to support the sentence. *See United States v. Carter,* 489 F.3d 528, 539–40 (2d Cir.2007), *cert. denied sub nom. Bearam v. United States,* —— U.S. ——, 128 S.Ct. 1066, 169 L.Ed.2d 814 (2008). Insofar as we discuss information derived from sealed documents, those documents are unsealed to the limited extent referenced in this order, although the full documents shall remain physically withheld from public review. *See United States v. Verkhoglyad,* 516 F.3d 122, 124 n. 2 (2d Cir.2008).

it is clearly improbable that the guns were related to the offense."

Freddy argues that there was no evidence that he stored drugs or drug proceeds at his residence and the firearm found there was not loaded. As for the firearm found at 3 Way, Freddy argues that there was no evidence that drugs were stored or sold there and that the evidence established that Freddy delivered cocaine at locations other than 3 Way.

The District Court's rejection of these arguments was neither based on clearly erroneous factual findings nor legal error. Contrary to the Fermins' contentions, this enhancement does not require evidence that the weapons were used or loaded. As we have explained,

> [T]he dangerous-weapon enhancement reflects the understanding that the mere presence of firearms in connection with a drug transaction can increase the risk of violence. Indeed, the mere presence of a gun, *loaded or not,* can escalate the danger. This is so not only because an unloaded firearm may quickly and easily be loaded and used ... but also because the presence of a firearm may increase the risk that others will react in violent ways.

*United States v. Smythe,* 363 F.3d 127, 129 (2d Cir.2004) (per curiam) (citations and internal quotation marks omitted).[2]

■ As for Freddy's argument that there was insufficient evidence of drug activity by him at 3 Way, we previously held that "[a]mple evidence demonstrated that Freddy engaged in numerous narcotics transactions from the office [at 3 Way] where the gun was found. Moreover, in a taped narcotics-related conversation Freddy made various references to this gun." *Fermin,* 32 F.3d at 678. Although we stated this in the course of rejecting Freddy's sufficiency challenge to his § 924(c) conviction for use of the shotgun found at 3 Way and that conviction was subsequently vacated in light of *Bailey,* our review of the record establishes that the District Court's determinations for purposes of the enhancement were not clearly erroneous. The District Court did not err in finding the weapons' connection with the offenses not "clearly improbable."

## V. Section 3553(a) Factors

■ Finally, Juan and Freddy challenge the District Court's consideration of the sentencing factors set forth in Section 3553(a), Title 18 of the United States Code. Juan argues that the District Court failed to consider the improper denial of his suppression motion, as indicative of the weakness of the government's case, as well as the lesser punishments given to co-conspirators. Freddy argues that the District Court failed to consider that the offense involved only $36,000 worth of cocaine and the evidence of his rehabilitation.

■ "[T]he law in this circuit is well established that, in the absence of record evidence suggesting otherwise, we presume 'that a sentencing judge has faithfully discharged her duty to consider the statutory factors.'" *United States v. Verkhoglyad,* 516 F.3d 122, 129 (2d Cir. 2008) (quoting *United States v. Fernandez,* 443 F.3d 19, 30 (2d Cir.), *cert. denied,* ── U.S. ──, 127 S.Ct. 192, 166 L.Ed.2d 143 (2006)). We do not find this presumption

---

**2.** Reliance on *United States v. North,* 900 F.2d 131, 135 (8th Cir.1990), is misplaced because the unloaded shotgun and inoperable rifle at issue in that case were found in the room of the defendant's son, who testified that the weapons were his and were used for hunting.

Nor is *United States v. Khang,* 904 F.2d 1219, 1224 (8th Cir.1990), helpful to defendants since in that case the government had conceded that the firearm had no relationship to the narcotics offense.

overcome in this case. We previously affirmed the denial of the suppression motion, *see Fermin,* 32 F.3d at 676–77, which, we note, concerned alleged government misconduct in securing authorization for the wiretaps, *not* "the nature and circumstances of the offense," *see* 18 U.S.C. § 3553(a)(1). In addition, as the government notes, Juan did not even raise this argument below. Juan's reliance on the shorter sentences for codefendants who pled guilty and the non-prosecution of co-conspirators is similarly unavailing. We do not see any inexplicable unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6); *United States v. Elfgeeh,* 515 F.3d 100, 139 (2d Cir.2008); *United States v. Wills,* 476 F.3d 103, 110 (2d Cir.2007).

Nor did the District Court err in failing to consider that the conspiracy involved $36,000 worth of cocaine. As discussed above, and contrary to Freddy's insistence, the District Court properly determined that the offense involved a much greater quantity of cocaine. The record further reflects that the District Court did consider Freddy's efforts at rehabilitation.

We have reviewed all of appellants' arguments and find them to be without merit. The judgments of the District Court are AFFIRMED.